**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| BEACON FISHERIES INC., on behalf of itself and all others similarly situated,<br><br>    *Plaintiff,*<br><br>    v.<br><br>MOWI ASA, MARINE HARVEST USA, LLC, MARINE HARVEST CANADA, INC., DUCKTRAP RIVER OF MAINE LLC, GRIEG SEAFOOD ASA, GRIEG SEAFOOD ROGALAND AS, GRIEG SEAFOOD FINNMARK AS, GRIEG SEAFOOD BC LTD., LERØY SEAFOOD GROUP ASA, LEROY SEAFOOD USA, INC., SALMAR ASA, SCOTTISH SEA FARMS LTD., BREMNES SEASHORE AS, OCEAN QUALITY AS, OCEAN QUALITY NORTH AMERICA INC., AND OCEAN QUALITY PREMIUM BRANDS, INC.,<br><br>    *Defendants.* | **CASE NO.**<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Beacon Fisheries Inc., individually and on behalf of a proposed class of direct purchasers of Farmed Atlantic Salmon, brings this class action under the federal antitrust laws for treble damages, demands a jury trial, and alleges as follows:

**NATURE OF THE CASE**

1.      Beginning at least as early as July 2015, Defendants—the leading producers of Farmed Atlantic Salmon that is sold in the United States—entered into an agreement, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Farmed Atlantic Salmon sold in the United States and elsewhere at supra-competitive levels.  As a result of Defendants'

1

unlawful conduct, Plaintiff and the Class (as defined below) paid artificially inflated prices for Farmed Atlantic Salmon and as a result have suffered antitrust injury to their business or property.

2.     In February 2019, the European Commission announced that its antitrust enforcement agents had executed dawn raids on corporate offices and facilities of several Defendants in collaboration with the competition enforcement authorities of various member states of the European Union.  According to the European Commission, the raids were prompted by "concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices . . . ."  These concerns stemmed from the fact that the European Commission had received information "from different actors operating at different levels in the salmon market, alleging that some Norwegian producers of farmed Norwegian Atlantic salmon participate in or have participated [in] different ways of price coordination in order to sustain and possibly increase prices of farmed Norwegian Atlantic salmon."

3.     Plaintiff brings this action under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 ("Sherman Act") and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 ("Clayton Act"), and asserts the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, the investigation made by its attorneys.

## DEFINITIONS

4.     "Farmed Atlantic Salmon" refers to farm-raised Atlantic salmon and salmon products into which Farmed Atlantic Salmon is incorporated.

5.     The "Class Period" is from at least as early as July 1, 2015 through the present.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action to recover treble damages, and costs of suit and reasonable attorneys' fees, resulting from the Defendants' and their Co-Conspirators' violations of the Sherman Act, 15 U.S.C. §§ 1, 3.

7.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

8.      Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, is found in, or transacts business in this District.

9.      The activities of Defendants were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

10.      This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District; (b) produced, sold, shipped, and delivered substantial quantities of Farmed Atlantic Salmon throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

**PLAINTIFF**

11.     Plaintiff Beacon Fisheries Inc. ("Plaintiff"), is a Florida corporation with its principal place of business in Jacksonville, Florida.  Plaintiff purchased Farmed Atlantic Salmon directly from one or more of the Defendants during the Class Period and has suffered monetary loss as a result of the unlawful conduct alleged herein.

**DEFENDANTS**

*Mowi and Marine Harvest Defendants*

12.     Defendant Mowi ASA, formerly known as Marine Harvest ASA, is the world's largest producer of Farmed Atlantic Salmon.  Mowi ASA is a Norwegian public company headquartered in Bergen, Norway, that is listed on the Oslo Stock Exchange.  Mowi ASA is engaged in the production, processing, and sale of Farmed Atlantic Salmon, with operations in Norway, Scotland, Canada, the Faroe Islands, Ireland, Chile and the United States.  Mowi ASA has a share of between 25% and 30% of the global salmon market.  Mowi ASA sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

13.     Defendant Marine Harvest USA, LLC is a wholly-owned subsidiary of Mowi ASA, with its principal place of business in Miami, Florida.  Marine Harvest USA sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

14.     Defendant Marine Harvest Canada, Inc., is a wholly-owned subsidiary of Mowi ASA and is headquartered in Campbell River, British Columbia, Canada.  Marine Harvest Canada sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

15.     Defendant Ducktrap River of Maine LLC ("Ducktrap") is a Maine limited liability company and 100% owned and controlled subsidiary of Mowi.  Ducktrap's principal place of business is located at 57 Little River Dr., Belfast, Maine.  Ducktrap processes salmon

4

into finished products.  For example, Ducktrap produces smoked salmon, under various brands, such as Kendall Brook and Ducktrap.

16.     The Mowi and Marine Harvest Defendants are referred to collectively herein as "Mowi."

*The Grieg Defendants*

17.     Defendant Grieg Seafood ASA is one of the world's largest producers of Farmed Atlantic Salmon.  Grieg Seafood ASA is headquartered in Bergen, Norway and is listed on the Oslo Stock Exchange.  Grieg sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

18.     Defendant Grieg Seafood Rogaland AS is a wholly-owned subsidiary of Grieg Seafood ASA, one of the world's largest producers of Farmed Atlantic Salmon.  Grieg Seafood Rogaland operates a salmon farm in Rogaland, Norway.  Grieg Seafood Rogaland sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

19.     Defendant Grieg Seafood Finnmark AS is a wholly-owned subsidiary of Grieg Seafood ASA.  Grieg Seafood Finnmark operates a salmon farm in Finnmark, Norway.  Grieg Seafood Finnmark sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

20.     Defendant Grieg Seafood BC Ltd. is a wholly-owned subsidiary of Grieg Seafood ASA.  Grieg Seafood BC is headquartered in Campbell River, British Columbia, Canada.  Grieg Seafood BC sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

21.     The Grieg Defendants are referred to collectively herein as "Grieg."

*The Lerøy Defendants*

22.     Defendant Lerøy Seafood Group ASA is one of the world's largest producers of farmed Atlantic Salmon.  Lerøy Seafood Group is headquartered in Bergen, Norway and is listed on the Oslo Stock Exchange.  In its 2017 annual report, Lerøy Seafood Group boasted, "Lerøy Seafood Group is now a fully integrated company, having achieved control of the entire value chain for a full range of seafood products – from the sea to the consumer."  Lerøy Seafood Group ASA sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

23.     Defendant Leroy Seafood USA, Inc., is a wholly-owned subsidiary of Lerøy Seafood Group.  Leroy Seafood USA is based in Chapel Hill, NC.  Leroy Seafood USA sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

24.     The Lerøy Defendants are referred to collectively herein as "Lerøy."

*SalMar*

25.     Defendant SalMar ASA ("SalMar") is a Norwegian public limited company listed on the Oslo Stock Exchange.  According to its website, SalMar is one of the world's largest producers of farmed salmon and owns 100 licenses for marine production of Atlantic salmon in Norway. In addition to its 50% stake in Norskott Havbruk AS, which in turn owns 100% of Scottish Sea Farms Ltd., SalMar also owns 34% of the Icelandic aquaculture company Arnarlax HF.  SalMar has a substantial secondary processing business, which is co-located with its headquarters in Frøya, Norway.  SalMar sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

6

*Scottish Sea Farms*

26.     Defendant Scottish Sea Farms Ltd. ("Scottish Sea Farms") is a United Kingdom Private Limited Company with its head office located in Stirling, Scotland.  Scottish Sea Farms' registered office address is in London, United Kingdom.  Scottish Sea Farms is the United Kingdom's second-largest salmon producer, with a capacity of 30,000 tons of harvested fish. Scottish Sea Farms sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

27.     Scottish Sea Farms is wholly owned by Norskott Havbruk AS.  Norskott Havbruk AS is 50% owned by Lerøy Seafood Group ASA and SalMar.  Norskott Havbruk AS was set up in 2001 for the sole purpose of acquiring the company currently named Scottish Sea Farms Ltd.

*Bremnes*

28.     Defendant Bremnes Seashore AS ("Bremnes") is a salmon farming company that is headquartered in Bremnes, Norway.  Bremnes sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

*The Ocean Quality Defendants*

29.     Defendant Ocean Quality AS is a salmon distribution business headquartered in Bergen, Norway.  Grieg owns a controlling 60% stake in Ocean Quality AS and Bremnes owns 40%.  Ocean Quality AS sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

30.     Defendant Ocean Quality North America Inc., is a wholly-owned subsidiary of Ocean Quality AS and is headquartered in Burnaby, British Columbia, Canada.  It is in the business of distributing Farmed Atlantic Salmon produced by Grieg and Bremnes.  Ocean Quality North America sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates.

31.     Defendant Ocean Quality Premium Brands, Inc. is a wholly-owned subsidiary of Ocean Quality AS and is headquartered in Burnaby, British Columbia, Canada.  Ocean Quality is in the business of distributing Farmed Atlantic Salmon produced by Grieg and Bremnes.  Ocean Quality Premium Brands sold Farmed Atlantic Salmon in the United States during the Class Period directly and through its affiliates

32.     The Ocean Quality Defendants are referred to collectively herein as "Ocean Quality."

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

33.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the co-conspirators are named as Defendants in this Complaint.

## INTERSTATE TRADE AND COMMERCE

34.     The activities of Defendants and their Co-Conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

35.     During the Class Period, Defendants and their Co-Conspirators produced, sold, and shipped substantial quantities of Farmed Atlantic Salmon in a continuous and uninterrupted flow of interstate and foreign commerce.

36.     In 2017, 1,910,600 tons of farmed Atlantic Salmon were produced in Norway, the United Kingdom, North America, and Chile. Norway (1,087,000 tons (57%) dominates the United Kingdom (156,900 tons (8%)), North America (145,500 tons (8%)), and Chile (521,200 tons (27%)) in the production of Farmed Atlantic Salmon.  Focusing on the northern hemisphere only, Norwegian production is 78% of total northern hemisphere output, followed by the UK (11%) and North America (10%).

8

37.     All five of the producer Defendants (Marine Harvest, Salmar, Lerøy Seafood, Greig Seafood, Bremnes Seashore) are in the top ten producers in Norway and together sell 57% of total Norwegian production.  Three producer Defendants (Marine Harvest, Scottish Sea Farms, Greig Seafood) are among the UK's top five producers with a total of 66% of total UK production. Two producer Defendants (Marine Harvest, Greig Seafood) are in the top five producers in North America with a combined 34% of total North American production.

38.     Defendants' control of the majority of Norwegian and UK production enables them to control prices for Atlantic Salmon farmed in the northern hemisphere. Smaller producers must follow Defendants' pricing. Otherwise, they would lose sales if they overpriced their product or would rapidly run out of product if they tried to undercut Defendants, either way leaving Defendants in charge of the market. Chilean farmed salmon does not drive pricing because it is not a first-tier substitute for northern hemisphere farmed salmon due to its differing taste profile and quality.

## FACTUAL ALLEGATIONS

*European Union Competition Authorities' Investigation of the*
*Farmed Atlantic Salmon Price Industry*

39.     In early February 2019, the European Commission began an antitrust investigation of key producers in the Farmed Atlantic Salmon market and announced that:

> [O]n 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon . . .  The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union). The Commission officials were accompanied by their counterparts from the relevant national competition authorities.

*See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm.

40.     The European Commission raids targeted the corporate offices of several Norway-based Farmed Atlantic Salmon producers, including Mowi's facilities in Rosyth,

Scotland and in Sterk, The Netherlands; Grieg's plant in Lerwick, Shetland Islands; and a facility in Stirling, Scotland that is operated by Scottish Sea Farms, which is jointly owned by SalMar and Lerøy.  Norway is beyond the reach of the European Commission's authority and therefore it does not have jurisdiction to conduct raids there.

41.     The European Commission's antitrust investigation was spurred by "concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels . . . ."  As confirmed by a letter that the European Commission sent to at least one of the raided companies, it had received information "from different actors operating at different levels in the salmon market, alleging that some Norwegian producers of farmed Norwegian Atlantic salmon participate in or have participated [in] different ways of price coordination in order to sustain and possibly increase prices of farmed Norwegian Atlantic salmon."  *See* https://www.theguardian.com/uk-news/2019/feb/20/eu-raids-salmon-farmers-in-scotland-in-price-fixing-inquiry.

42.     The letter states that the raided Farmed Atlantic Salmon producers have, since at least November 2017, allegedly been:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

43.     Defendants Mowi, Grieg, and SalMar have all confirmed that they were the targets of European Commission raids.  https://www.undercurrentnews.com/2019/02/19/mowi-dutch-plant-also-raided-as-ec-confirms-probe-of-alleged-salmon-cartel/.

44.     Mowi disclosed in its 2018 annual report that it was among the companies that were raided by European Commission competition authorities, noting that "[t]he Commission was acting on concerns that the inspected companies may have violated EU antitrust rules."

45.     Grieg disclosed to the Oslo Stock Exchange on February 19, 2019, that the European Commission "performed an inspection at Grieg Seafood Shetland to explore potential anticompetitive behavior in the salmon industry."

46.     Lerøy filed a notice with the Oslo Stock Exchange on February 19, 2019, stating that the "EU's competition authorities . . . conducted an inspection at the premises of Scottish Sea Farms Ltd. a company owned 50% by Lerøy Seafood Group . . . ."

47.     SalMar disclosed to the Oslo Stock Exchange on February 19, 2019, that European Commission competition authorities raided "Scottish Sea Farms Ltd., in which SalMar ASA indirectly owns 50 per cent."

*Farmed Atlantic Salmon*

48.     Atlantic Salmon (*Salmo salar*) is a species of fish of the family *Salmonidae*. Other species of the family are Pacific salmon and trout.  While Atlantic salmon can be wild or farmed, the great majority that is sold for human consumption is farmed.  Wild populations are generally at very low levels and their commercial harvest is limited, and wild-caught salmon is substantially more expensive than Farmed Atlantic Salmon, often by a factor of two.

49.     Atlantic salmon is an ideal species for aquaculture.  It grows wells in sea cages, commands a high market value and adapts well to farm environments away from its native range. It is the most important species of Salmonid in the world and is mainly farmed in Norway, Chile, Scotland, and Canada.  These countries represent approximately 95% of the total harvest.

50.     Farmed Atlantic Salmon constitute more than 90% of the farmed salmon market and 50% of the total global salmon market (farmed and wild).  The major markets for Farmed Atlantic Salmon include the European Union and the United States.

*The Production Cycle*

51.     Salmon are anadromous, which means they spend most of their adult life in the ocean but return to fresh water to reproduce.  The total Farmed Atlantic Salmon lifecycle takes approximately 24-36 months, with 10-16 months in fresh water, followed by 14-22 months in sea water.  This is dependent on water temperature.  As salmon are cold-blooded animals, water temperature plays an important role in their growth rate.

52.     Farmed Atlantic Salmon are hatched, raised, and harvested under controlled conditions.  Food stock (parent fish) is selected from the best-performing fish on a sea farm and moved into fresh water tanks or cages, usually during the autumn.  During late autumn the eggs are taken from the mature female salmon, and these are fertilized by mixing them with milt from mature male fish.

53.     The fertilized eggs are stored in individual containers or trays supplied with high-quality fresh water.  This is done in purpose-built hatcheries which have to be maintained to the highest quality standards.  Within 2-3 months the eggs have hatched to produce fry.

54.     During the early spring, the fries start to feed and they are transferred to small tanks in the hatchery.  Feeding is partly by hand and partly automatic.  As the fish grow during the summer period, they are moved outdoors into bigger tanks, ponds, or into net cages in fresh water lakes.  By the second spring (at about 12 months) the fish will have reached the size at which they are ready to adapt to a life in seawater.  They are now ready for transfer to the sea.  At this stage the fish are termed "smolts."

12

55.     During late spring the smolts are transferred to sea cages.  Sea cages are made from netting that is hung from a floating collar.  Sea cages are particularly difficult to site and manage.  Due to environmental considerations arising from the presence of a large biomass in a fixed position, ocean currents strong enough to create a flushing action are essential to having the caged salmon feed, grow, and exist in a pure water environment.  Threats from sea predators like seals, diseases like sea lice, and exposed ocean waters require continuous monitoring of the fish throughout the grow-out cycle.

56.     The following graphic depicts the lifecycle of Farmed Atlantic Salmon:



*See* http://www.griegseafoodcanada.com/wp-content/uploads/2011/11/lifecycle.png.

57.     Salmon are carnivorous.  Farmed Atlantic Salmon are generally fed compound fish feeds in the form of specially formulated pellets.  In order to reproduce the normal pink color associated with wild salmon that the market demands, pigment is included in the feed pellets several weeks before harvesting.  Many sea farms use computerized systems that control automated feeding systems, with feedback mechanisms to detect when the fish finish feeding.

58.     When they are large enough to be harvested, the salmon are removed from the cages and moved immediately to processing facilities that gut and prepare the fish for transport to customers.  Farmed Atlantic Salmon cannot be harvested before a buyer has been identified because this will ruin the essential freshness of the fish.  Because of the two- to three-year production cycle, harvestable fish must be sold before the next generation of fish can be introduced into the ocean cages.  This means that a fixed volume of salmon must be moved into the market within a short period of time.

59.     The salmon go to a primary processor, where they are eviscerated—meaning that the viscera and blood are removed—leaving them as gutted, head-on Farmed Atlantic Salmon. They then are sent to a secondary processor, which produces fillets and other cuts, or a value-added processor, which produces smoked salmon, ready meals, and other value-added Farmed Atlantic Salmon products.

*Global Production of Farmed Atlantic Salmon*

60.     Historically, the Norwegian government has heavily subsidized the Farmed Atlantic Salmon industry.  Between 1991 and 2012, Norwegian salmon producers were subject to 24% anti-dumping and countervailing duties on salmon imported into the United States. These U.S. duties, which applied to fresh and chilled fresh Atlantic salmon, effectively barred the importation of salmon into the United States.

61.     The lifting of these duties against Norwegian farmed salmon in 2012 opened the U.S. market to Norwegian producers, which were the largest producers of Farmed Atlantic Salmon in the world.  In addition to sales to the Far East and the European Union, the United States became a significant market for Norwegian Farmed Atlantic Salmon.

62.     Farmed Atlantic Salmon is a global commodity.  Fish that are ready to be harvested from the sea pens are sold as the sun rises..  For example, as the sun rises in Japan, Norwegian salmon farmers begin selling product.  As daylight approaches the European Union, marketing efforts turn towards sales into Europe.  As day approaches the United States, Norwegian farmers sell to U.S. buyers.

63.     Although this sequenced selling suggests that demand in each market would cause a fluctuation in price as the day unfolds, in reality the price of fresh farmed salmon is instantaneously communicated across the globe at the moment of sale.  This price transparency substantially eliminates the ability of Norwegian salmon farms to negotiate price based on local supply and demand.

64.     This global transparency also creates a commodity price that is closely tracked in numerous publicly available indices that are reported and easily accessed on the internet.  As a result, Norwegian salmon farmers bear the typical risk of a commodity market, which includes substantial fluctuations in price as demand and available supply are reported on a historical, spot, and forward-looking basis.  To forestall this risk, Defendants must collude to ensure that prices remain stable, or increase, and to ensure that revenues are sufficient to sustain the continuous costs of the lengthy production cycle.

65.     Defendants often speak with each other regarding the available supply of salmon. Defendants also frequently buy and sell farmed fresh salmon from each other.

66.     A risk for salmon producers, which is common to all livestock operations, is the production cycle.  During the production cycle, the salmon must be fed and medicated on a regular basis.  This eliminates the ability of salmon farmers to adapt production to demand since the fish must be fed each day.  As a consequence, costs will remain constant regardless of market conditions.  This exposes salmon farming to a "boom and bust" market cycle since market variables act independently of the production cycle.  To manage this risk, salmon farmers must have the ability to control price when and as each generation of farmed salmon is harvested for market.

67.     Although Canada is a significant producer of Farmed Atlantic Salmon in North America, Canadian supply is restricted by environmental regulations and limited siting.

68.     Likewise, U.S. producers are not significant market participants due to environmental regulations and limited acceptable farm sites.  Farmed Atlantic Salmon is only produced in Washington and Maine and on a relatively small scale.

69.     Salmon farming in Chile also does not significantly impact demand for Farmed Atlantic Salmon.  Due to different climatic and sea conditions, Chilean farm-raised Atlantic salmon does not have the same taste profile and quality as Atlantic salmon raised in the Northern Hemisphere.  Furthermore, due to the limited growing season, Chilean salmon are often smaller than their North Atlantic counterparts.  Since Chilean salmon is of lower quality and transportation costs are high, most of the Chilean imports into the United States are sold as fillets rather than whole fresh gutted Atlantic salmon.

*The U.S. Farmed Atlantic Salmon Market*

70.     The United States is the second-largest market for Farmed Atlantic Salmon, surpassed only by the European Union.  *See* Mowi Q4 2018 Presentation, *available at* http://hugin.info/209/r/2234685/879436.pdf.

16

71.     The volume and value of Farmed Atlantic Salmon imports into the United States increased by about 10% over approximately the past year.  *See* https://www.intrafish.com/marketplace/1654239/us-imports-of-fresh-salmon-fillets-spike.

72.     Farmed Atlantic Salmon sold in the United States is sold under long-term contracts that commit the buyer to specified volumes of fish.  Pricing, however, is not established long-term but fluctuates month-to-month with the market.  Buyers are not able to negotiate price; rather, they are forced to pay the commodity price that fluctuates over time.  Because of buyer contracts with fluctuating commodity pricing and because buyers are reluctant to risk changing suppliers, defendants have a captive market in the United States and as a result do not compete with each other.

73.     Over the past five years, prices for Farmed Atlantic Salmon have steadily increased.  There is virtually no price disparity among Defendants for sales of Farmed Atlantic Salmon into the United States.  In addition, U.S. buyers invariably pay the same price as buyers in the European Union.

*Salmon Production Cost Structure*

74.     Fish feed is the aquaculture industry's biggest cost.  It represents 50% to 70% of fish farmers' production costs.  Fish meal and fish oil have traditionally been the main ingredients of salmon feeds.

75.     Since 2009, fish oil prices have increased. The average price of fish oil was about $1,550 per ton in 2017.  Fish meal has also seen an increasing trend in price.  On average, fish meal has been more expensive, but over the last couple of years fish oil has surpassed fish meal in price.

76.     With reduced availability and increased prices due to the high demand for marine by-products by the global aquaculture industry, one of the major shifts in the selection of salmon

17

feeds has been from the use of fish meal and fish oils to cheaper and more readily available non-marine raw materials.  Fish meal protein is being substituted with plant proteins.

77.     Defendants have taken full advantage of this cost-reducing feed alternative.  As shown by the following chart, globally in 1990 fish oil and fish meal represented 83% of salmon feed ingredients.  By 2017, fish oil and fish feed represented only 22% of salmon feed ingredients for Norwegian producers, while vegetable meal and vegetable oil comprised 70% of the cost of salmon feed.



78.     Defendants benefited enormously from the cost advantage that has arisen from the shift to non-marine raw materials.  As the following chart demonstrates, as fish oil and fish feed costs have risen dramatically, by 2015 both rapeseed oil and soymeal saw a decreasing price trend that has stabilized at the low end of the cost index.



79.     Despite these dramatic shifts in Defendants' production cost structure, prices for

Defendants' Farmed Atlantic Salmon have continued to increase during the last five years.

## THE CHARACTERISTICS OF THE MARKET FOR FARMED ATLANTIC SALMON MAKE IT CONDUCIVE TO COLLUSION

80.     Several important economic characteristics of the market for Farmed Atlantic

Salmon make it plausible that the Defendants and their Co-Conspirators colluded to fix the price

of Farmed Atlantic Salmon sold in or into the United States.

*Functional Interchangeability*

81.     Farmed Atlantic Salmon grown and sold by Defendants and their Co-Conspirators

during the Class Period are not functionally distinguishable in any material respect.

82.     As noted in a 2018 European Union report, "[t]he output of [Farmed Atlantic

Salmon] is highly commoditized, *i.e.*, there is little differentiation between farms and

competition is based purely on price."

*High Barriers to Entry*

83.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Therefore, high barriers to entry help facilitate a cartel.

84.     There are substantial barriers to entry into the Farmed Atlantic Salmon market. Any new entrant would face a costly and lengthy start-up period, during which it would be required to invest millions of dollars to arrange for sites, permits, plants, and equipment, research and development, transportation, distribution infrastructure, and skilled labor.  New entrants must also disrupt long-standing relationships between customers and existing suppliers in order to sell their products.

85.     A substantial barrier to entry is the fact that the existence of the salmon biomass in coastal regions accessible to employees of farming operations has a significant impact on the surrounding environment.  As a consequence, salmon farming is under tight government regulation and the permitting process is slow and rigorous.

86.     Moreover, there are very few places in the world where Farmed Atlantic Salmon can be raised effectively and efficiently, due to governmental issues and environmental conditions.  The primary regions that support the production of Farmed Atlantic Salmon are shown below:



*See* https://salmonfarmingstandrews.wordpress.com/.

87.    The relatively limited number of sites with conditions suitable for salmon farming and the regulatory burdens associated with these sites mean that operators of salmon farms have very limited opportunities to expand capacity.

88.    As a consequence of the limited availability of suitable production facilities, the Farmed Atlantic Salmon industry has undergone substantial and significant consolidation. Consolidation in the Farmed Atlantic Salmon industry has escalated dramatically in recent years, as acknowledged by Mowi:  "During the last decade the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue."  *See* https://www.undercurrentnews.com/2019/02/19/mowi-dutch-plant-also-raided-as-ec-confirms-probe-of-alleged-salmon-cartel/ at page 37.

21

89.     Since expanded sea water and fresh water production facilities are limited, large producers used their capital to acquire smaller producers in order to maximize production available from existing sites.

90.     Consolidation has also resulted in higher efficiencies of scale that reduce costs, for example, volume purchases of feed stock, more efficient transportation, and computerized feeding technology that reduces labor inputs.

91.     As noted in a 2018 European Union report, with respect to Farmed Atlantic Salmon, "large enterprises which can reduce costs of production through economies of scale and offer the lowest price, have a competitive advantage."

92.     Unlike other industrial processes, output capacity cannot be effectively managed. The long two- to three-year production cycle means that salmon farmers must continually process fingerlings into smolts that are then moved into sea cages for finishing prior to harvest in order to meet anticipated market demand.

93.     Pricing for Farmed Atlantic Salmon is correlated across regions and markets, and thus price-fixing in one market affects prices in the others.

*Price Inelasticity*

94.     When sellers of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.  Otherwise, increased prices would result in declining sales, revenues, and profits.

95.     Farmed Atlantic Salmon is an essential seafood in the U.S. and it is highly perishable.  There are no viable substitute products.

22

96.     As noted by Mowi, "[t]he long production cycle and a short time window available for harvesting leave salmon farmers with limited flexibility to manage their short-term supply." *See* Mowi 2017 Annual Report at 235.

97.     Therefore, pricing for Farmed Atlantic Salmon is highly inelastic.

*Opportunities for Collusion*

98.     Defendants and their Co-Conspirators attended the same industry events, fostering opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

99.     Defendants also exchange price and production information and buy Farmed Atlantic Salmon from each other.

## DEFENDANTS' FARMED ATLANTIC SALMON CONSPIRACY

100.     During the Class Period, Defendants and their Co-Conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to raise, fix, maintain, or stabilize prices of Farmed Atlantic Salmon sold in or into the United States.

101.     Defendants and their Co-Conspirators did not compete, and instead enjoyed business insulated from competition.

102.     Defendants and their Co-Conspirators participated in meetings, conversations, and communications in Norway and the European Union to discuss the pricing of Farmed Atlantic Salmon sold in or into the United States.

103.     Defendants and their Co-Conspirators agreed during those meetings, conversations, and communications on pricing for Farmed Atlantic Salmon sold in or into the United States.

104.     Defendants and their Co-Conspirators offered pricing in the United States and elsewhere in accordance with their conspiratorial agreements.

105.     Defendants and their Co-Conspirators sold Farmed Atlantic Salmon to customers in the United States and elsewhere at collusive and non-competitive prices.

106.     Defendants and their Co-Conspirators accepted payments for Farmed Atlantic Salmon sold in the United States and elsewhere at collusive and non-competitive prices.

107.     Defendants and their Co-Conspirators held meetings and conversations to monitor and police their price-fixing conspiracy.

108.     Defendants and their Co-Conspirators affirmatively undertook measures to conceal their unlawful conduct.

109.     During the Class Period, Defendants and their Co-Conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy.  These activities included, but were not limited to, the following:

      a.     Agreeing to unlawfully coordinate pricing for Farmed Atlantic Salmon;

      b.     Discussing and exchanging pricing information with regard to Farmed Atlantic Salmon and reaching conspiratorial agreements by means of communications on multiple occasions to coordinate exchanges and adjustments of Farmed Atlantic Salmon pricing.

110.     Defendants and their Co-Conspirators coordinated their Farmed Atlantic Salmon pricing by incorporating changes to pricing based on the conspiratorial agreements they made with each other.

111.     Defendants and their Co-Conspirators knew and intended that their conspiracy and their actions relating thereto would have a direct impact on prices for Farmed Atlantic Salmon sold to all direct purchasers throughout the United States.  Their scheme was implemented, succeeded, and affected the prices for all Farmed Atlantic Salmon.

**CLASS ACTION ALLEGATIONS**

112.     Plaintiff brings this action on behalf of itself and pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as the representative of a Class defined as follows:

> All individuals and entities who purchased Farmed Atlantic Salmon in the United States directly from any of the Defendants or their Co-Conspirators, or their respective controlled subsidiaries, affiliates, or joint-venturers between July 1, 2015 and the present.  Defendants and all parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators thereof are excluded from the Class.

113.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  While the exact number of Class members is unknown to Plaintiff, it is believed to be at least in the hundreds.  The identity of the members of the Class can be readily determined from information and records in the possession of the Defendants or their Co-Conspirators.

114.     Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct of the Defendants and their Co-Conspirators., *i.e.*, they have paid artificially inflated prices for Farmed Atlantic Salmon as a result of the Defendants' and their Co-Conspirators' anticompetitive and unlawful conduct.

115.     Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct of the Defendants and their Co-Conspirators., *i.e.*, they have paid artificially inflated prices for Farmed Atlantic Salmon as a result of the Defendants' and their Co-Conspirators' anticompetitive and unlawful conduct.

116.     Plaintiff is represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

117.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because the Defendants and their Co-Conspirators have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in the Defendants' and their Co-Conspirators' anticompetitive and unlawful conduct.

118.    There are core questions of law and fact common to the Class, such as:

a.      Whether Defendants and their Co-Conspirators conspired to fix, raise, maintain, or stabilize prices of, or to allocate the supply of, Farmed Atlantic Salmon;

b.      The participants in, and the duration of, the conspiracy;

c.      Whether the conspiracy caused Farmed Atlantic Salmon prices to be higher than they would have been in the absence of Defendants' and their Co-Conspirators' conduct;

d.      Whether the conduct of the Defendants and their Co-Conspirators caused injury to the business or property of Plaintiff and members of the Class;

e.      Whether the conduct of the Defendants and their Co-Conspirators violates Section 1 of the Sherman Act;

f.      Whether the Defendants and their Co-Conspirators undertook actions to conceal their unlawful conspiracy; and

g.      The appropriate measure of the damages suffered by the Class.

119.    A class action is superior to the other methods available for the fair and efficient adjudication of this litigation since individual joinder of all members of the Class is impracticable.  Individual litigation presents the potential for inconsistent judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class

action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

120.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their Co-Conspirators.

### ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

121.     The Defendants' and their Co-Conspirators' anticompetitive conduct has had the following effects:

   a.  price competition has been restrained, suppressed, or eliminated with respect to Farmed Atlantic Salmon;

   b.  the prices of Farmed Atlantic Salmon have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

   c.  purchasers of Farmed Atlantic Salmon have been deprived of free and open competition in the Farmed Atlantic Salmon market.

122.     As a result of the contract, combination, or conspiracy, Plaintiff and Class members paid anticompetitive and higher prices for Farmed Atlantic Salmon than they would have in the absence of the conspiracy, and Plaintiff and Class members have sustained injury to their business or property.

### PLAINTIFF'S CLAIMS ARE TIMELY

123.     The conduct of the Defendants and their Co-Conspirators persisted for at least four years (2015-2019).  Had governmental authorities in Europe not launched an antitrust investigation into anticompetitive conduct in the market for Farmed Atlantic Salmon, it is likely that the conspiracy would have continued undetected.

124.     Plaintiff and the members of the Class had no knowledge of the anticompetitive conduct by Defendants alleged herein, or of facts sufficient to place them on notice of the claims

set forth herein, until February 19, 2019, at the earliest.  As a result, Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, Defendants' participation in the conspiracy alleged herein until February 19, 2019, at the earliest.

125.    No information about Defendants' participation in the Farmed Atlantic Salmon conspiracy was available in the public domain to Plaintiff and the members of the Class prior to February 19, 2019, when a news publication noted that certain Atlantic salmon farming facilities had been raided by European competition authorities. Prior to that time, there was insufficient information to suggest that Defendants were involved in a Farmed Atlantic Salmon conspiracy. For these reasons, the statute of limitations did not begin to run until at the earliest February 19, 2019, with respect to the claims that Plaintiff and the members of the Class have alleged in this Complaint.

126.    Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class until at least February 19, 2019.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class, from at least as early as July 2015 through at least February 19, 2019.  During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to this Complaint.

127.    Before at least February 19, 2019, Plaintiff and members of the Class were unaware of the unlawful conduct of Defendants.  No information, actual or constructive, was made available to Plaintiff and the members of the Class that would have suggested to Plaintiff that they were being injured by unlawful conduct of Defendants.

128.    Defendants' affirmative acts were wrongfully concealed and carried out in a manner that precluded detection.

129.    By its very nature, Defendants' participation in the anticompetitive conspiracy was inherently self-concealing. Defendants' meetings and communications were secret, and Defendants kept the facts about their conduct from being discovered by any member of the public or other direct purchasers with whom they did business.

130.    Defendants suggested publicly that their pricing activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, the Defendants and their Co-Conspirators misled Plaintiff and members of the Class as to the true, collusive, and coordinated nature of their price-fixing activities.

131.    The wrongful conduct of the Defendants was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

132.    Plaintiff and the members of the Class could not have discovered Defendants' participation in the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, its conduct.

133.    For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled and did not begin to run until at least February 19, 2019.

## COUNT I: CLAIM FOR VIOLATION OF THE SHERMAN ACT

134.    Plaintiff incorporates by reference the allegations set forth above and adopts them as if fully set forth herein.

135.    Defendants and their Co-Conspirators entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act.

136.   The acts done by each of the Defendants and their Co-Conspirators as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

137.   Commencing at least as early as July 2015 and continuing until the present, the exact dates being currently unknown to Plaintiff, Defendants and their Co-Conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Farmed Atlantic Salmon, creating anticompetitive effects.

138.   These anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Farmed Atlantic Salmon throughout the United States.

139.   As a result of the conspiracy alleged herein, the prices charged to Plaintiff and members of the Class for Farmed Atlantic Salmon were unlawfully raised, fixed, maintained, or stabilized in the United States.

140.   The conspiracy has had the following effects:

a.   prices paid by Plaintiff and members of the Class for Farmed Atlantic Salmon were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.   Plaintiff and members of the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Farmed Atlantic Salmon; and

c.   competition in the market for Farmed Atlantic Salmon has been unlawfully restrained, suppressed, or eliminated.

141.   As a direct and proximate result of the unlawful conduct of the Defendants and their Co-Conspirators, Plaintiff and members of the Class have been damaged and will continue

30

to be damaged by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct alleged herein.

142.     The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.       That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class Representative and its counsel as Class Counsel;

B.       That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their Co-Conspirators as alleged in this Complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §§1, 3;

C.       That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.       That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.       That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.       That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiff and members of the Class receive such other or further relief as may

be just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

issues so triable.

Dated May 15, 2019

*/s/ Manuel J. Dominguez*
Manuel J. Dominguez (Fla. Bar No. 0054798)
Leslie M. Kroeger (Fla. Bar No. 989762)
COHEN MILSTEIN SELLERS & TOLL PLLC
2925 PGA Boulevard, Suite 204
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1400
jdominguez@cohenmilstein.com
lkroeger@cohenmilstein.com

Gregory P. Hansel (Fla. Bar No. 607101)
Randall B. Weill
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU & PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Ste. 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

*Counsel for Beacon Fisheries Inc. and
the Proposed Class*